## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for FIRST NATIONAL BANK OF GEORGIA,** ] ] ] ] ] | |
| **Plaintiff,** ] | |
| ] | **CIVIL ACTION FILE NO.** |
| **v.** ] | 3:13-cv-14-TCB |
| ] | _____ |
| **HOWARD B. LIPHAM, III, RANDALL F. EAVES, MARY M. COVINGTON, GRADY W. COLE, RICHARD A. DUNCAN, W. THOMAS GREEN, JR., LEMUEL G. JOYNER, R. DAVID PERRY, THOMAS T. RICHARDS, J. THOMAS VANCE AND CHARLES M. WILLIS, SR.,** ] ] ] ] ] ] ] ] ] ] ] | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

Federal Deposit Insurance Corporation ("FDIC"), as Receiver ("FDIC-R")

for First National Bank of Georgia ("FNBG" or the "Bank") of Carrollton,

Georgia, hereby files its Complaint against Howard B. Lipham, III ("Lipham"),

Randall F. Eaves ("Eaves"), Mary M. Covington ("Covington"), Grady W. Cole

("Cole"), Richard A. Duncan ("Duncan"), W. Thomas Green, Jr. ("Green"),

Lemuel G. Joyner ("Joyner"), R. David Perry ("Perry"), Thomas T. Richards

("Richards"), J. Thomas Vance ("Vance"), and Charles M. Willis, Sr. ("Willis")

(Lipham, Eaves, Covington, Cole, Duncan, Green, Joyner, Perry, Richards, Vance, and Willis are collectively referred to herein as the "Defendants") for negligence, gross negligence and breach of fiduciary duties, showing the Court the following:

## I.    INTRODUCTION

1.    FDIC-R brings this lawsuit in its capacity as Receiver for FNBG, a failed financial institution.  On January 29, 2010, FNBG was closed and the FDIC-R was appointed as receiver pursuant to 12 U.S.C. § 1821(c).  At that time, the FDIC-R succeeded to all the rights, titles, and privileges of FNBG and its depositors, account holders, other creditors, and stockholders.   12 U.S.C. § 1821(d)(2)(A)(i).  This action is brought against the Defendants, eleven of FNBG's former officers and/or directors for negligence, gross negligence and breach of fiduciary duty in their operation and management of the lending function of the Bank.  The FDIC-R seeks compensatory damages and other relief as a result of Defendants' tortious conduct (the "Damages") that took place prior to the failure of the Bank.

2.    The Defendants were charged with, in addition to other duties, the responsibility of operating and managing the lending function of the Bank. Particularly, each of the Defendants served as members of FNBG's Executive Loan Committee (the "ELC") and, in that capacity, had direct responsibility for the approval of loans.  In gross derogation of their duty to engage in safe and sound

banking practices, Defendants, among other things: (i) failed to properly oversee FNBG's lending function; (ii) improperly approved millions of dollars in loans; (iii) allowed and encouraged an excessive and irresponsible concentration of acquisition, development, and construction ("ADC") loans; (iv) accepted loan participations from other banks and entities without conducting proper due diligence regarding the subject loans; (v) knowingly and/or recklessly approved loans and loan participations which violated FNBG's loan policies (referred to cumulatively as the "Loan Policy") and applicable federal and state regulations; and (vi) knowingly permitted poor underwriting in contravention of the Bank's policies and reasonable industry standards.

3.     The actions and omissions that give rise to Defendants' liability include, among other things: (i) originating, recommending, and/or approving loans in violation of the Bank's Loan Policy; (ii) extending credit to borrowers who were not creditworthy; (iii) extending credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information; (iv) approving and originating speculative commercial real estate loans despite known adverse economic conditions in the local real estate market; (v) permitting unsafe and unsound concentrations of credit; (vi) failing to properly manage and preserve the resources of the Bank; and (vii) failing to supervise, manage, conduct, and

direct the business and affairs of the Bank to ensure compliance with prudent principles of banking.

4.      The Defendants' negligent and grossly negligent conduct giving rise to their liability is highlighted by their repeated approval of the Bank's purchase of participation interests in higher-risk commercial real estate ("CRE") and ADC loans without ensuring that FNBG had conducted its own independent underwriting of the loans, as required by the Loan Policy.  Instead, the Defendants improperly approved these participation purchases based on inadequate underwriting by other institutions, most notably First City Bank of Stockbridge, Georgia ("First City"), which failed and went into receivership on March 20, 2009.

5.      As described in detail below, the Defendants' negligence, gross negligence and breach of fiduciary duties in their numerous, repeated, and obvious breaches and violations of the Bank's Loan Policy, underwriting requirements, banking regulations, and prudent and sound banking practices are exemplified by fourteen (14) CRE and ADC loans and loan participations approved by the Defendants from July 6, 2006, through February 26, 2008 (collectively, the "Exemplar Loans"), which proximately caused Damages to the Bank of an amount to be proven at trial in excess of $29.97 million.

6.      The FDIC-R does not seek repayment of any of the negligently made loans described in this Complaint.  The compensatory damages sought herein are

those caused by the Defendants' wrongful conduct in approving such loans.

7.     The actions and inactions of Defendants were the direct and proximate cause of the Damages the FDIC-R now seeks to recover.

## II.    JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction of this matter, because actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.  The FDIC has the power to bring suit in any court of law.  12 U.S.C. § 1819.

9.     This Court has personal jurisdiction over Defendants who at all relevant times were residents of and conducted FNBG's business in the State of Georgia.

10.    Venue is proper in this district under 28 U.S.C. § 1391(b) as one or more of the Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.   THE PARTIES

11.    FDIC is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C.  12 U.S.C. § 1821(d). Upon the Bank's failure on January 29, 2010, the FDIC-R succeeded to all rights,

titles, and privileges of FNBG and its depositors, account holders, creditors, and stockholders.  12 U.S.C. § 1821(d)(2)(A)(i).

12.    FDIC-R is the successor to, among others, all claims originally held by any stockholder, member, account holder, or depositor of FNBG upon the Bank's failure.

13.    Lipham was President of FNBG from March 18, 2004, until July 1, 2007, and Chief Executive Officer ("CEO") and a director from May 15, 2006, until the Bank failed.  Lipham is a resident of the State of Georgia residing in Carroll County.

14.    Eaves was President of FNBG and a director from July 1, 2007, until the Bank failed.  Eaves is a resident of the State of Georgia residing in Haralson County.

15.    Covington was the Executive Vice President of FNBG and a director from July 3, 2007, until the Bank failed.  Covington is a resident of the State of Georgia residing in Carroll County.

16.    During the relevant time, Defendants Lipham, Eaves, and Covington served as officers of FNBG, as well as directors and members of the ELC (the "Officer/Director Defendants").

17.    Cole was a director from 1992 until the Bank failed.  Cole is a resident of the State of Georgia residing in Carroll County.

18.    Duncan was a director from 1991 until the Bank failed.  Duncan is a resident of the State of Georgia residing in Carroll County.

19.    Green was a director from 1988 until the Bank failed.  Green is a resident of the State of Georgia residing in Carroll County.

20.    Joyner was a director from 1986 until he retired on October 31, 2006. Joyner is a resident of the State of Georgia residing in Carroll County.

21.    Perry was a director from 1984 until the bank failed.  Perry is a resident of the State of Georgia residing in Carroll County.

22.    Richards was a director from 1984 until the Bank failed.  Richards is a resident of the State of Georgia residing in Carroll County.

23.    Vance was a director from 1991 until the Bank failed.  Vance is a resident of the State of Georgia residing in Carroll County.

24.    Willis was a director from 1977 until he resigned on January 13, 2009. Willis is a resident of the State of Georgia residing in Carroll County.

25.     During the relevant times, Defendants Cole, Duncan, Green, Joyner, Perry, Richards, Vance, and Willis served as directors and members of the Bank's ELC (the "Director Defendants").

## IV.    FACTS

26.    FNBG was headquartered in Carrollton, Georgia, and opened for business on September 16, 1946, as a national bank.  FNBG's name at the time of

charter was West Georgia National Bank.  On July 1, 2007, the Bank acquired First National Bank of Georgia of Buchanan, Georgia, and took that entity's name. FNBG was wholly owned by WGNB Corporation, a single bank holding company. At the time of its failure, the Bank operated 14 full service locations in three Georgia counties west of Atlanta.

### A.    Standards for Risk Management Procedures in Banking

27.    It is a fundamental tenet of banking that loan underwriting practices are the primary determinant of a bank's credit risk and credit availability and one of the most critical aspects of loan portfolio risk management.  Functionally, loan underwriting standards define a bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics.  Loan underwriting standards are also important in protecting a bank's capital which can erode from unsafe and unsound lending practices.

28.    Underwriting practices (which are described in Parts 364 and 365 of the FDIC Rules and Regulations) can generally be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.  Underwriting practices also encompass the management and administration of a bank's loan portfolio, including its growth, concentrations in specific markets, lending area, written lending policies, and adherence to written underwriting policies.

8

29.    The loan approval process is a bank's foremost means to control loan quality and maintain the integrity of a bank's loan portfolio.  An effective loan approval process establishes minimum requirements for the information and analysis upon which each credit decision is based.  An effective loan approval process ensures acceptable credit, collateral, and repayment sources at the origination of each loan.

30.    Also fundamental to the proper management of any bank's loan portfolio is appropriate risk diversification.  12 C.F.R. § 30, "Standards for Safety and Soundness" (Appendix A), requires banks to afford adequate consideration to concentrations of credit risk in their underwriting and loan approval practices.

**B.    Defendants Failed to Follow the Fundamental Tenets of Banking in Administering the Loan Approval Process and Managing FNBG's Loan Portfolio**

31.    Throughout its history, FNBG focused its lending on real estate related loans.  Beginning in 2005, however, Defendants recklessly and on an uninformed basis caused FNBG to embark on an aggressive growth strategy.  To that end, FNBG began to significantly increase its portfolio of CRE and ADC loans that included $23.8 million in poorly underwritten loan participations with the since failed First City Bank of Stockbridge, Georgia.  Eight of the fourteen Exemplar Loans discussed below are participation loans purchased by the Bank, four from First City and four from other banks.  Six of the eight participations at

issue were secured by real estate located outside of the Bank's primary and secondary trade areas.

32.    In 2005, bank examiners informed FNBG's Board that it needed to be mindful of Bank policy limits relating to its concentration of CRE loans, which FNBG had exceeded.  Examiners also noted that the Bank had insufficient credit administration practices.   Examiners cautioned that the Bank had inadequate expertise in the administration of its loan function, an inadequate loan review function, and problem loan management that warranted additional improvement. Despite these early warnings, the Defendants failed to implement sufficient corrective measures.

33.    Even in absence of these warnings by regulators, the Defendants knew or should have known that concentrating a loan portfolio in CRE and/or ADC loans substantially increases a bank's risk for numerous reasons, including the well-known principles that: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the real estate and housing markets, in particular, are cyclical by nature; (c) the primary source of repayment for these types of loans is the cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations.   In short, concentrations of CRE/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market

conditions and require vigilant adherence to sound lending practices and careful monitoring of concentration ratios.

34.    The Defendants were regularly provided with information of key economic indicators, such as housing sales and home prices, which were used in the underwriting process.  Despite receiving information showing a slowing of housing sales and peaking of home prices in 2006, Defendants continued to approve high risk and speculative ADC and CRE loans and loan participations, including the Exemplar Loans.

35.    In 2006, examiners again noted that the Bank was exceeding loan-to-value ratio guidelines and noted an increase in adversely classified assets. Examiners cautioned that the Bank continued to have an excessive concentration in ADC lending and emphasized close monitoring of these types of loans.  Examiners criticized FNBG's compliance with the appraisal standards required by the Bank's Loan Policy.  Examiners noted that on at least six occasions the Bank had failed to perform proper analysis prior to renewing the terms of outstanding CRE loans.

36.    During the time period in which the recommended Defendants approved the Exemplar Loans, the Bank's total ADC and CRE lending steadily increased by 61 percent, from $265 million as of June 30, 2006, to $406 million as of December 31, 2008.

37.    In 2007, examiners found that the Bank's classified assets were high at 48 percent of capital and were expected to increase as market weaknesses continued.  Examiners also cautioned the recommended Defendants to strengthen the Bank's credit risk management practices and to establish specific policy limits for concentrations as a percentage of capital.

38.    As of March 31, 2008, examiners noted that the Bank's classified assets had reached 184 percent of the Bank's capital.  Corresponding with the Bank's high levels of classified assets, the Bank's liquidity became deficient in 2008 as a result of loan impairment charges and reduced earnings attributable to the Bank's excessive concentrations in CRE and ADC loans.  Examiners found that the primary cause of the Bank's condition was the board's failure to recognize the risks related to loan concentrations and to implement adequate loan diversification practices.  Examiners also noted that the Bank's risk management systems were deficient and not in compliance with asset concentration guidance in OCC Bulletin 2006-46 which applied "Interagency Guidance on CRE Concentration Risk Management" to national banks.  71 Fed. Reg. 74580 (Dec. 12, 2006).  Among other things, the bulletin set concentration thresholds for CRE lending as a percentage of an institution's total capital and instructed banks that strong risk management practices, sufficient capital, and careful oversight by management and the board of directors are necessary for any bank with significant

CRE lending.

39.    On November 12, 2008, the OCC and the board entered into a Formal Agreement to correct various deficiencies related to the Bank's concentrations in CRE/ADC lending and high level of classified assets.

40.    On December 18, 2008, the OCC notified the board that it had established an Individual Minimum Capital Requirement ("IMCR") for the Bank due to increased risk from the Bank's excessive CRE loan concentration. The IMCR required FNBG to achieve a tier 1 capital leverage ratio of at least 9 percent and a total risk based capital ratio of at least 13 percent by March 31, 2009 – a date which was subsequently extended by the OCC to April 17, 2009. The Defendants failed to bring the Bank into compliance with the IMCR.

41.    In 2009, examiners identified numerous unsafe or unsound practices, including problem loan identification, asset management, concentration risk management, and failure to comply with the November 12, 2008, Formal Agreement. The examiners concluded that the level of problem loans was a direct result of an inadequate portfolio diversification strategy that resulted in a high concentration of CRE loans.

42.    Contrary to the fundamental tenets of banking, the Defendants were negligent, grossly negligent, and breached their fiduciary and other duties of care to the Bank by, among other things, (i) failing to ensure that the Bank established

effective risk management practices sufficient to limit the Bank's exposure to CRE and ADC concentrations, and (ii) allowing the Bank to grow significantly without risk limits and monitoring practices commensurate with the increased risk inherent in FNBG's loan portfolio.

43.     Further, even after warnings by regulators, the Defendants persisted in increasing the Bank's already high exposure by: (i) failing to implement and follow sound loan underwriting and credit administration practices; (ii) failing to implement prudent risk management strategies; (iii) failing to follow the Bank's Loan Policy and ensure that bank management followed the Loan Policy; (iv) failing to properly supervise, manage, and oversee the Bank's loan operations; and (v) taking actions that negatively impacted the Bank's assets and liquidity.  The Bank failed on January 29, 2010.

### C.     FNBG's Loan Approval Authorities and Loan Policy

44.     FNBG's Loan Policy dated July 9, 2004, was revised on August 14, 2007.  The 2007 revision, which only applies to two of the fourteen Exemplar Loans, did not materially change the policy's relevant provisions which are as follows:

> a)     Purchase of a loan participation required analysis in accordance with FNBG's credit standards as if FNBG originated the loan itself, including, but not limited to, an analysis of collateral

14

quality and a credit file.

b)  The Bank was to decline any "undesirable loans," including loans to new businesses when repayment depended solely on the profitable operation or liquidation of the business.

c)  The maximum loan-to-value ("LTV") ratio allowed was 65 percent for a loan secured by raw land, 75 percent for commercial acquisition and development loans, 80 percent for commercial, multi-family, and other non-residential loans, and 85% for 1-4 family residential construction loans.

d)  Guarantor creditworthiness, including income, cash flow, financial statements, and credit reports, were to be analyzed prior to loan closing.

e)  Borrower creditworthiness, including income, cash flow and financial statements, were to be analyzed prior to loan closing.

f)  Real estate loans were to document any secondary sources of repayment.

g)  An appraisal performed by a state certified or licensed appraiser was generally required for all realty-related financial transactions and was to be completed and reviewed by Bank personnel prior to funding the loan.

h) The credit files for all construction and/or development loans secured by real estate were to document: (i) the borrower's capacity to service the debt; (ii) the expected sources and uses of funds; (iii) an economic analysis of the project; (iv) the amount of equity invested by the borrower; (v) the value of the mortgaged property; (vi) the expected date of project completion; and (vii) the monthly lot absorption rate.

i) Quality and liquidity of collateral were to be confirmed before the loan was made.

45.    Each of the Exemplar Loans required approval by the Executive Loan Committee which was required to approve unsecured loans in excess of $250,000, and secured loans in excess of $500,000.

**D.    Loan Underwriting Violations and Deficiencies**

46.    As detailed herein, substantial losses were sustained by reason of Defendants' material and reckless departures from safe and sound banking practices.  Each of the Defendants repeatedly knowingly or recklessly disregarded the Bank's Loan Policy and approved loans and loan participations involving borrowers who were not creditworthy and/or projects that provided insufficient collateral and guarantees for repayment.  Between July 6, 2006, and February 26, 2008, Defendants repeatedly engaged in a pattern and practice of knowingly or

recklessly approving loans and loan purchases that: (i) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 44 above; (ii) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and (iii) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

### 14 Exemplar Loans

47.    Each of the Exemplar Loans violated FNBG's Loan Policy in numerous respects and illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that resulted in the catastrophic losses and that constitute negligence, gross negligence and breach of fiduciary duties either separately or together as a pattern or practice. As shown by the Exemplar Loans, Defendants had a routine practice of approving exceptions to Loan Policy which had the cumulative effect of undermining the applicable Loan Policies.

### DHM, LLC[1]

48.    The $6,500,000 loan to DHM, LLC was approved by Cole, Duncan,

---

[1]   Borrowers/guarantors are identified in this Complaint by their initials only in order to preserve their right to financial privacy afforded by applicable Georgia and federal banking laws. The Defendants, however, will be provided with the complete names of borrowers/guarantors.

Green, Joyner, Lipham, Perry, Richards, Vance, and Willis on July 6, 2006.  The stated purpose of the loan was to refinance a residential development loan made by BB&T and other lenders to develop 173 acres of land in South Fulton County, Georgia into 362 residential lots.

49.     The violations of duties by the aforementioned Defendants with regard to the DHM, LLC transaction include, but are not limited to, the following:

a)     The Defendants approved a Bank policy exception for the loan-to-value ratio of 84%, which exceeded the policy limit of 75%.

b)     The Defendants did not require that the borrower or guarantor provide their most recent year's tax returns.

c)     There was no verification of the borrower's claim that a contract with a home builder to buy all of the lots upon completion, which had expired on its face in 2004, was still in effect.

d)     There was no verification of the guarantor's claimed liquidity of $6,081,000, as stated in his personal financial statement.

e)     The aforementioned Defendants approved and funded the loan despite the fact that a current appraisal of the collateral was not available at the time of approval.

f)     The refinance aspect of the loan equated to a five year period of

18

development which exceed the Bank policy limits of a three-year maturity for this type of loan.

50.     The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## RWH, Inc.

51.     On August 8, 2006, Cole, Duncan, Green, Joyner, Lipham, Perry, Richards, Vance, and Willis voted to approve a $2,570,000 loan to RWH, Inc., the principal of which was represented to be Clayton A. Coe – then a Vice President and Senior Commercial Loan Officer at First City.  The stated purpose of the loan was to refinance 67 residential lots in Fairburn, Georgia that were represented to be under contract.

52.     The violations of duties by the aforementioned Defendants with regard to the RWH, Inc. loan include, but are not limited to, the following:

    a)    The ELC approved a Bank policy exception for the loan-to-value ratio of 80%, which exceeded the policy limit of 75%.

    b)    The ELC approved a Bank policy exception for not having the most recent year's tax returns from guarantor Clayton Coe, who was known to be in the midst of a divorce in which rights to marital assets were in dispute.

    c)    The collateral was located outside of FNBG's primary and

secondary trade areas in violation of Bank Loan Policy.

d)      No tax returns or financial statements were obtained from the borrower in violation of Bank Loan Policy.

e)      There was no independent verification of the builder contracts to purchase the lots or of the builder's financial condition prior to the loan's approval in violation of Bank Loan Policy.

53.    The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## WP, LLC

54.    On October 3, 2006, Cole, Duncan, Green, Joyner, Lipham, Perry, Richards, Vance, and Willis voted to approve a $4,500,000 loan to WP, LLC to finance the development of 62 acres of raw land in Henry County, Georgia into 115 residential lots.  The loan was an 89% participation purchased from First City, which used $2,900,000 in loan proceeds to pay off its previous loan to WP, LLC.

55.    The violations of duties by the aforementioned Defendants with regard to the WP, LLC transaction include, but are not limited to, the following:

a)      Notwithstanding FNBG's large participation interest in the loan, the aforementioned Defendants "rubber-stamped" this participation purchase and failed to analyze the loan in

20

accordance with the Bank's credit standards as if it had originated the loan, in material violation of the Loan Policy.

b)   The participation was purchased without adequate financial information from the borrowers or the guarantor.  In violation of the Loan Policy, the loan file contained neither:  (i) any borrower financial statements, (ii) current tax returns from the guarantor, or (iii) any confirmation of the 25% equity injection as required by the Bank Loan Policy.

c)   The guarantor's income was insufficient to service the debt, and the loan file did not contain any confirmation of the guarantor's representation of $2.9 million cash on hand.  In fact, the borrower's principal (who was also the guarantor) had previously been incarcerated for forgery and theft which was a matter of public record, but was unknown or not considered by the Defendants when the loan was approved.

d)   Neither the construction contract nor any documents reflecting the builder's financial strength to purchase the completed lots were contained in the loan file.

e)    The approval of this loan violated the Loan Policy, because the collateral was located outside of FNBG's primary and secondary trade areas.

f)    The appraiser was not on the approved list, in violation of the Loan Policy.

56.    The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## **MY**

57.    On November 21, 2006, Cole, Duncan, Green, Lipham, Vance and Willis voted to approve a $2,100,000 loan to MY to finance the acquisition and development of 169.56 acres of raw land in Meriwether County, Georgia.

58.    The violations of duties by the aforementioned Defendants with regard to the MY transaction include, but are not limited to, the following:

a)    The aforementioned Defendants approved Bank policy exceptions for the collateral being located outside of FNBG's primary and secondary trade areas, for an excessive loan-to-value ratio, and for the use of appraisers and attorneys not on the Bank's approved list.

b)    The credit memorandum had conflicting descriptions of the amount of acreage to serve as the collateral.

c)    The borrower had only $25,000 cash on hand with no apparent ability to fund the required equity in the project.

d)    The mortgage taken on the borrower's house was third in priority and of little or no value as collateral.

e)    The appraised value of $12,500 per acre was manifestly inconsistent with the borrower's stated business plan to sell the property in 10 acre lots for approximately $530,000 each.

59.    The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## EMO, LLC

60.    On December 5, 2006, Cole, Duncan, Green, Lipham, Perry, Richards, Vance, and Willis voted to approve a $3,000,000 loan to EMO, LLC, which was a 33.8% participation purchased from Fairfield Financial Services, Inc. The stated purpose of this loan was to finance the development of 87 residential lots in a subdivision in Fayette County, Georgia.

61.    The violations of duties by the aforementioned Defendants with regard to the EMO, LLC transaction, include, but are not limited to, the following:

a)    The aforementioned Defendants approved Bank policy exceptions for the collateral being located outside of FNBG's primary and secondary trade areas, for a loan-to-cost ratio of

100%, and for the use of appraisers and attorneys not on the Bank's approved list.

b)    The appraisal which was prepared for Fairfield Financial Services, Inc. was not reviewed by Bank management until December 11, 2006, six days after the loan was approved and three days after the loan closing.

c)    The loan file did not contain any borrower financial statements, and there is no evidence that financial statements were ever sought or reviewed.

d)    The guarantor had over $55 million in contingent liabilities, with liquidity of only $280,454 – of which $192,454 was held in a limited liability company and the balance held in joint accounts.  The guarantor subsequently filed for bankruptcy in May of 2008.

62.    The negligent and grossly negligent approval of this loan participation resulted in substantial damages in an amount to be proved at trial.

## **DB**

63.    The $1,860,000 DB loan was approved by Cole, Duncan, Green, Lipham, Perry, Richards, Vance, and Willis on December 12, 2006.  The stated purpose of this loan was to enable the borrower to buy out a business partner by

refinancing 44 vacant lots in Henry County, Georgia. The loan was a 100% participation purchased from First City.

64. The violations of duties by the aforementioned Defendants with regard to the DB transaction include, but are not limited to, the following:

a) Notwithstanding FNBG's 100% participation interest in the loan, the aforementioned Defendants "rubber-stamped" this participation purchase and failed to analyze the loan in accordance with the Bank's credit standards as if it had originated the loan, in material violation of the Loan Policy.

b) The aforementioned Defendants approved Bank policy exceptions for the collateral being located outside of the bank's primary and secondary trade areas and for a loan-to-value ratio of 80%, which exceeded the policy limit of 75%.

c) The appraiser was not on the Bank's approved list and the appraisal was not reviewed internally until December 13, 2006, the day after the Defendants approved the loan. When reviewed, the Bank's appraisal reviewer noted numerous violations of the Uniform Standards of Professional Appraisal Practice ("USPAP"), including no sales history for the three previous years and no reasonable marketing period. The

appraisal reviewer also noted that 12 of the 44 lots were located in a flood plain.

d)   The closing attorneys were not on the Bank's approved list, in violation of the Loan Policy.

e)   There is no evidence that the borrower complied with the 25% cash or equity investment requirement.

f)   The borrower's alleged contract to sell the lots was with a newly formed entity and was insufficiently documented. Particularly, the alleged contract of sale between the borrower and a developer was supported only by an undated commitment letter from Mark Conner at First City to a developer proposing to finance home construction on only 22 of the 44 lots.

g)   The borrower had two outstanding federal tax liens.

65.   The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## LC, LLC

66.   On January 16, 2007, Cole, Duncan, Green, Perry, Vance, and Willis voted to approve an $8,000,000 loan to LC, LLC to pay off existing debt and fund development and remaining amenity costs in a large golf course and residential development in Cherokee County, Georgia.  The loan was a 36% participation

interest in a loan originated by One Georgia Bank which paid off a previous loan by Fairfield Financial Services in which FNBG had a $3 million participation interest.

67.    The violations of duties by the aforementioned Defendants with regard to the LC, LLC transaction include, but are not limited to, the following:

a)    The aforementioned Defendants approved Bank policy exceptions for the collateral being located outside of the Bank's primary and secondary trade areas, for expired financial statements, and for a potential loan-to-cost violation.

b)    The appraiser was not on the approved list, and the appraisal was not internally reviewed by the Bank.

c)    The loan file did not contain the borrower's financial statements.

d)    In June 2007, prior to the disbursement of the loan, the ELC was notified that the borrower had incurred $2.8 million in cost overruns that exceeded the proposed loan which was intended to completely finance the project.  The ELC approved a loan modification that allowed the borrower to fund the shortfall with the borrower's portion of future lots sales.

e)    Patrick Malloy, who was a nephew of director Richards and a

Bank director from August 2007 to July 2008, was not required to be a guarantor despite having an ownership interest in the borrower entity.

68.    The negligent and grossly negligent approval of this loan participation resulted in substantial damages in an amount to be proved at trial.

## DD, Inc.

69.    On January 30, 2007, Cole, Duncan, Lipham, Perry, Vance, and Willis voted to approve a $7,900,000 loan to DD, Inc. to refinance a loan made by First City for the acquisition of 81 acres in Henry County, Georgia and the development of the property into 211 residential lots. The loan was an 83% participation purchased by FNBG from First City, with the remaining 17% purchased by High Trust Bank of Stockbridge, Georgia.  First City was paid off on its previous $3.2 million loan at closing.

70.    The violations of duties by the aforementioned Defendants with regard to the DD, Inc. transaction include, but are not limited to, the following:

a)    Notwithstanding FNBG's substantial participation interest in the loan, the aforementioned Defendants "rubber-stamped" this participation purchase and failed to analyze the loan in accordance with the Bank's credit standards as if it had originated the loan, in material violation of the Loan Policy.

No separate and independent credit memorandum was even prepared.

b) The aforementioned Defendants approved Bank policy exceptions for the collateral being located outside of the Bank's primary and secondary trade areas, for expired financial statements, and for a potential loan-to-cost violation.

c) The appraiser was not on the Bank's approved list, and the appraisals were addressed to First City.   FNBG's appraisal review noted that the property was not owned by the borrower but still rated the appraisal as acceptable.

d) The closing attorneys were not on the Bank's approved list.

e) There is no evidence that the borrower complied with the 25% cash or equity investment requirement.

f) The aforementioned Defendants approved the Bank's loan of the funds even though there was insufficient evidence that the borrower had the required earnings and cash flow with which to support the debt, as the borrower was a new entity with no financial statements.

g) There is no evidence that a proper credit investigation of the individual guarantor was conducted.

71.    The negligent and grossly negligent approval of this loan participation resulted in substantial damages in an amount to be proved at trial.

## CH, LLC

72.    The $2,600,000 CH, LLC loan was approved by Cole, Duncan, Green, Lipham, Perry, Richards, Vance, and Willis on June 29, 2007.  The stated purpose of the loan was to finance the purchase of vacant lots in a subdivision in Paulding County, Georgia.

73.    The violations of duties by the aforementioned Defendants with regard to the CH, LLC transaction include, but are not limited to, the following:

a)    The ELC approved Bank policy exceptions for not requiring the borrower and guarantors' 2006 tax returns, and a loan-to-value ratio of 90%, which exceeded the Bank policy limit of 75%.

b)    The appraisal indicates a 98% loan-to-value ratio, and the internal appraisal review indicates a 105% loan-to-value ratio.

c)    There was insufficient evidence that the borrower, a newly formed entity, or the guarantors had the required earnings and cash flow with which to support the debt.

d)    There is no evidence that the borrower complied with the 25% cash or equity investment requirement.

e)    The loan was for lots in phase two of a troubled subdivision.

However, at the time the loan was approved, only 1/3 of the project's "phase one" lots had been sold.

74.    The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## BI, LLC

75.     On May 22, 2007, Cole, Duncan, Green, Lipham, Perry, and Willis voted to approve a $2,500,000 loan to BI, LLC to finance the acquisition of 84.86 acres of property and the development of the property into 257 residential lots in Fulton County, Georgia.  The loan was a 25% participation purchased from First City.

76.    The violations of duties by the aforementioned Defendants with regard to the B.I. transaction include, but are not limited to, the following:

  a)    The aforementioned Defendants approved Bank policy exceptions for not requiring 2006 tax returns for the borrower or guarantors and a loan-to-cost ratio of 91%.

  b)    The aforementioned Defendants approved the Bank's loan of funds despite the collateral being located in the Bank's secondary trade area.

  c)    There is no evidence that the borrower complied with the 25% cash or equity investment requirement.

d) The borrower was a newly formed entity, and the individual guarantor's claim of $2,600,000 cash on hand as of October 30, 2006, was neither updated nor verified prior to closing.

e) The aforementioned Defendants approved the Bank's loan of the funds even though the individual guarantor's income was not sufficient to constitute a realistic source of repayment.

f) The loan package contained a report showing that, at the time the loan was approved, 695 vacant lots were already available in the development, a 57.5 month supply.

g) The appraisal was not reviewed prior to the approval of the loan and was addressed to First City.

h) The land was being purchased by the borrower from First City following foreclosure, which raised the prospect that First City was selling troubled assets for its own benefit.

77. The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## GPD, Inc.

78. On July 3, 2007, Cole, Covington, Duncan, Eaves, Lipham, Richards, Vance, and Willis voted to approve a $2,500,000 loan to GPD, Inc. to finance the development of a mixed use residential and retail development in DeKalb County,

32

Georgia.  The loan was a 58% participation purchased by FNBG from American United Bank.

79.     The violations of duties by the aforementioned Defendants with regard to the GPD, Inc. transaction include, but are not limited to, the following:

a)     The ELC approved Bank policy exceptions for the collateral being out of the Bank's primary and secondary trade areas and for a loan-to-cost ratio of 90%.

b)     The appraisal was addressed to the lead bank, conducted by an appraiser who was not on FNBG's approved list, and not reviewed by FNBG personnel prior to the loan approval.

c)     The closing attorney was not on the Bank's approved list.

d)     The lone guarantor was inadequate to support the loan. Particularly, the guarantor had a Beacon score below 700 and half of his income was derived from the borrower, though each was treated as a separate source of financial strength as justification for the loan.

e)     The Bank previously declined this loan as the lead bank, but later joined as a participant (along with another Bank that failed on October 23, 2009).

80.     The negligent and grossly negligent approval of this loan participation

purchase resulted in substantial damages in an amount to be proved at trial.

## FHP, LLC

81.     On July 17, 2007, Cole, Duncan, Eaves, Lipham, Perry, Richards, Vance and Willis voted to approve a $3,000,000 loan to FHP, LLC to finance the acquisition of 40 acres and development into 93 residential lots in Cobb County, Georgia. The loan was a 60% participation purchased from First Choice Community Bank.

82.     The violations of duties by the aforementioned Defendants with regard to the FHP, LLC transaction include, but are not limited to, the following:

> a)     The aforementioned Defendants approved Bank policy exceptions for not requiring 2006 tax returns for the guarantors, and for the appraiser and closing attorneys not being on the Bank's approved list.
>
> b)     The LTV ratio was greater than the amount allowed by the Loan Policy.  The approved LTV of 75% exceeded the policy limit of 65%.
>
> c)     The loan, as approved, required the borrowers to contribute 21% equity as the project progressed, rather than providing the equity in full at the loan's inception.  Further, the approved equity percentage was lower than the 35% equity required by

the Bank's Loan Policy.

d)    The aforementioned Defendants approved the Bank's loan of funds even though the borrower was a newly formed entity with no earnings history or financial statements.

e)    The credit memorandum identified 20 subdivisions within a three mile area of the project – constituting a 31.7 month supply of vacant lots.

f)    The aforementioned Defendants approved the Bank's loan of funds despite the fact that the project had no purchase contracts in place for the lots to be developed.

83.    The negligent and grossly negligent approval of this loan participation resulted in substantial damages in an amount to be proved at trial.

## HRP, LLC

84.    The $2,500,000 HRP, LLC loan was approved by Cole, Covington, Duncan, Eaves, Green, Lipham, Perry, Vance, and Willis on August 14, 2007.  The stated purpose of the loan was to finance the acquisition of 20 lots and the construction of speculative homes in Paulding County, Georgia.

85.    The violations of duties by the aforementioned Defendants with regard to the HRP, LLC transaction include, but are not limited to, the following:

a)    The ELC approved a Bank policy exception for a 100% loan-to-

cost ratio.

b)   There is no evidence that the borrower complied with the cash or equity investment requirement.

c)   The aforementioned Defendants approved the Bank's loan of funds despite failing to obtain any financial statements from the borrower.

d)   The prospects for repayment of the loan were poor.  The lots being financed were purchased by the borrower from a related entity under common ownership with the borrower when no third party lot sales had occurred.  Further, a portion of the loan proceeds were applied to another FNBG loan to mask a likely loan default and to obscure the Bank's need to increase its capital.

e)   The credit memorandum states that there were 58 subdivisions within a three mile radius and an 8.3 month supply of new homes.

86.   The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## HSW, LLC

87.   The $2,530,000 HSW, LLC loan was approved by Covington,

Duncan, Eaves, Perry, Vance, and Willis on February 26, 2008.   The stated purpose of the loan was to finance the acquisition of 34 units in a townhome project in Temple, Georgia from FNBG's Other Real Estate Owned ("OREO").

88.   The violations of duties by the aforementioned Defendants with regard to the HSW, LLC transaction include, but are not limited to, the following:

    a)    This loan violated the Bank's policy for financing OREO sales, because the borrower had an insufficient cash down payment and funds for that purpose were provided to the borrower using a separate FNBG loan.

    b)    The aforementioned Defendants approved the Bank's loan of funds despite the fact that the guarantor's personal financial statement was unsigned, cash and income were not verified, and no credit report was obtained.

89.   The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## V.   CAUSES OF ACTION

### Count I – Ordinary Negligence
### Under Georgia Law Against All Defendants

90.   The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

91.   Defendants, as officers and/or directors of FNBG, each owed the

Bank a duty of care under common law and O.C.G.A. §§ 7-1-490, 51-1-2, among other laws and regulations, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management, supervision, and conduct of FNBG's business and financial affairs, including its lending practices.   Also, each Defendant agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank.   The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

92.    Defendants are not entitled to the application of the business judgment rule because none of the Defendants' actions or inactions, which are the basis of this negligence claim, were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulators' warnings regarding loan underwriting and risk management deficiencies (¶¶ 32, 35, 37-38), repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations (¶¶

47-89), and exposed the Bank to undue risk by over-concentrating in ADC/CRE loans and purchasing participations without adequate risk management controls (¶¶ 4, 31-43), despite regulator warnings related thereto (¶¶ 32, 35, 37-38).

93.    Defendant Lipham, as President, CEO and a director, among other duties, was responsible for the overall management of the Bank including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business.  These duties included, but were not limited to: (i) ensuring that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE lending; (ii) ensuring that the Bank adhered to its lending and credit policies, loan approval processes and loan and credit administration practices; (iii) ensuring that the Bank complied with banking statutes/regulations; and (iv) ensuring that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank.  Further, as a member of the ELC, Lipham had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

94.    Defendant Eaves, as President and a director, among other duties, reported to Defendant Lipham and was responsible for the Bank's ADC/CRE

lending.  In these capacities, Eaves had the obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's ADC/CRE lending.  These duties included, but were not limited to, ensuring that the Bank had adequate loan policies, procedures and internal controls.  Both as an executive officer and member of the ELC, Eaves also had the duty to ensure that the Bank complied with the Loan Policy and banking laws and regulations, and that the ADC/CRE lending was conducted in a prudent and sound manner.

95.    Defendant Covington, as Executive Vice President and a director, among other duties, reported to Defendant Lipham and was responsible for ADC/CRE lending and, accordingly, had the obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank had adequate loan policies, procedures and internal controls relating to, among other things, ADC/CRE lending, that the Bank adhered to its policies, procedures and controls, and that the Bank complied with banking statutes/regulations and prudent and sound lending practices.

96.    By their actions and inactions, as specifically and generally described

herein, the Officer/Director Defendants, as officers of the Bank, failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.     As to Defendant Lipham, his negligence and grossly negligent acts included, without limitation:

(i)     Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)     Failing to monitor and supervise subordinate officers and employees of the Bank with respect to the ADC/CRE lending;

(iii)     Failing to ensure that loan participations purchased from other banks were independently underwritten and proper subjects for extensions of credit which had adequate collateral and sources of repayment;

(iv)     Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending;

(v)     Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of

being repaid by the debtors;

(vi)   Recklessly permitting the pursuit of a high-risk growth strategy for the Bank, which included an overconcentration of speculative, high risk, and poorly underwritten ADC/CRE loans and an excessive level of purchased loan participations with collateral outside the Bank's trade area;

(vii)  Failing to implement and follow sound underwriting and credit administration practices;

(viii)  Failing to implement prudent risk management strategies;

(ix)   Failing to follow the Bank's Loan Policy and failing to ensure that Bank management followed the Loan Policy; and,

(x)    Failing to properly supervise, manage, and oversee the Bank's loan operations.

b.    As to Defendant Eaves, his negligent and grossly negligent acts included, without limitation:

(i)    Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)   Failing to monitor and supervise subordinate officers and employees of the Bank with respect to the ADC/CRE lending;

(iii)  Failing to ensure that loan participations purchased from

42

other banks were independently underwritten and proper subjects for extensions of credit which had adequate collateral and sources of repayment;

(iv)   Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending;

(v)    Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vi)   Recklessly permitting the pursuit of a high-risk strategy on an overconcentration of speculative, high risk, and poorly underwritten ADC/CRE loans which included an excessive level of purchased loan participations with collateral outside the Bank's trade area;

(vii)  Failing to implement and follow sound loan underwriting and credit administration practices;

(viii) Failing to implement prudent risk management strategies;

(ix)   Failing to follow the Bank's Loan Policy and failing to ensure that Bank management followed the Loan Policy; and

(x)    Failing to properly supervise, manage, and oversee the Bank's loan operations.

c.     As to Defendant Covington, her negligent and grossly negligent

acts included, without limitation:

(i)     Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)    Failing to ensure that loan participations purchased from other banks were independently underwritten and proper subjects for extensions of credit which had adequate collateral and sources of repayment;

(iii)   Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending;

(iv)   Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(v)    Failing to follow the Bank's Loan Policy and failing to ensure that Bank management followed the Loan Policy; and

(vi)   Failing to properly supervise, manage, and oversee the Bank's loan operations.

97.    By way of example and not limitation, and as described above, the Officer/Director Defendants failed to adhere to lending policies, applicable requirements, and sound lending practices and thus knew or, in the exercise of

44

reasonable diligence, should have known that their practices and the practices of other FNBG officers and employees over whom they exercised supervisory control were improper, imprudent, and harmful to FNBG.

98.     In addition to the duties set forth in paragraph 91 above, Director Defendants Cole, Duncan, Green, Joyner, Perry, Richards, Vance and Willis had the duty under Georgia law to: (i) ensure that the Bank followed its own lending policies and  complied with all banking regulations; (ii) ensure that prudent loan underwriting and credit administration practices were followed; (iii) take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank; and (iv) to exercise ordinary care and diligence in the administration of the affairs of the Bank, including, but not limited to, the following:

a.     Informing themselves about the nature of and risks associated with proposed loans and loan participations before they approved them;

b.     Exercising independent judgment in connection with the review and approval or disapproval of loans and loan participations;

c.     Confirming that any loans they approved were underwritten in a safe and sound manner;

d.     Ensuring that any loans and loan participations they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of

loss to the Bank;

e.      Not approving loans and loan participations that exceeded the Bank's relevant concentration limits;

f.      Ensuring the Bank had adequate capital and other safeguards in place to mitigate the risk of loss from the high concentration of CRE/ADC loans; and

g.      Ensuring that any loans and loan participations approved did not violate applicable banking regulations.

99.     By their common actions and inactions, as described specifically and generally herein, Defendants, as directors of the Bank and members of the ELC, collectively failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.      Recklessly pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

b.      Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures and banking statutes and regulations;

c.     Failing to ensure that the Bank's ADC/CRE lending complied with prudent and sound lending practices;

d.     Failing to monitor and supervise the officers and employees of the Bank with respect to ADC/CRE lending;

e.     Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending;

f.     Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

g.     Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

h.     Failing to ensure that the ADC/CRE loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

i.     Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

j.     Failing to ensure that the credit transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

k.     Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

l.     Failing to implement and require bank officers to follow sound

47

loan underwriting and credit administration practices;

   m. Failing to implement and monitor prudent risk management strategies;

   n. Allowing officers of the Bank repeatedly to violate the Bank's Loan Policy and approving loans and loan participations that were in material violation of the Bank's Loan Policy; and

   o. Failing to properly supervise and oversee the Bank's loan operations.

  100. The general acts of negligence, gross negligence, and breach of fiduciary duty applicable to each is set forth in paragraphs 47 through 89.

  101. As a direct and proximate result of the negligent acts and omissions of each Defendant, including their lack of good faith and abuse of discretion, the FDIC-R has suffered Damages in an amount to be proven at trial.

  102. With respect to their negligent actions and inactions in managing the affairs of FNBG, Defendants pursued a common plan or design, other otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

**Count 2 – Gross Negligence Under
12 U.S.C. § 1821(k) and/or Georgia Law Against All Defendants**

  103. The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

104.   Section 1812(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

105.   In addition to and/or in the alternative to paragraphs 90 through 102, the acts or omissions of each of the Defendants, described particularly in paragraphs 47 through 89 of this Complaint, and especially for Damages occurring after the Defendants were warned by regulators, as set forth in paragraphs 32, 35, and 37 through 38, of: (i) an over-concentration of ADC and CRE loans; (ii) deficiencies in loan underwriting and credit administration; and (iii) a deterioration of the housing market, each of which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

106.   Each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

49

a.    Defendant Lipham, by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings (¶¶ 32, 35, 37-38); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶¶ 34, 47-89); permitting Bank employees to fund loans and loan participations without compliance with the Loan Policy (¶¶ 47-89); approving loan and loan participation transactions that failed to comply with the Bank's policy and safe and sound lending practices (¶¶ 47-89); and allowing the Bank's portfolio to be over-concentrated in speculative ADC/CRE loans and thereby harming FNBG's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-42).

b.    Defendant Eaves by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 47-89); disregarding regulator's warnings (¶ 32, 35, 37-38); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the real estate market (¶¶ 34, 47-89); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, and thereby harming FNBG's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-42).

c.     Defendant Covington by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 47-89); disregarding regulator's warnings (¶ 32, 35, 37-38); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the real estate market (¶¶ 34, 47-89); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, and thereby harming FNBG's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-42).

d.     Each Director Defendant as a director and member of the Loan Committee by, among other things, engaging in a common pattern and practice of collectively failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings (¶¶ 32, 35, 37-38); approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 47-89); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, thereby harming FNBG's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-42).

107.  As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, the FDIC-R has suffered Damages in an amount to be proven at trial.

108.   With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

**Count 3 – Breach of Fiduciary Duties
Under Georgia Law Against All Defendants**

109.   The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

110.   The Defendants occupied a fiduciary relationship with the Bank and are thus held to the standard of utmost good faith, honesty, and loyalty in the management, supervision, and conduct of the Bank's business and financial affairs. The Defendants' duties included, but were not limited to, those set forth in paragraphs 91, 93-95, 98 and 104 of this Complaint.

111.   In addition, the Defendants, individually and collectively, owed to FNBG, and its depositors and shareholders, a duty to exercise due care and diligence in the management and administration of FNBG's affairs, and were deemed to stand in a fiduciary relationship to FNBG, and were required to discharge their duties with the utmost good faith, diligence, care, loyalty, judgment and skill which ordinarily prudent persons would exercise under similar circumstances in like positions.

112.   The Defendants, individually and collectively, breached their

fiduciary duties to FNBG, and its depositors and shareholders, by not discharging their duties in good faith, and by failing to exercise that degree of diligence, care, loyalty, judgment and skill required of them in the conduct, direction, supervision and control of FNBG's business and affairs.   The Defendants committed or permitted acts and omissions which resulted in severe damage to FNBG, including, but not limited to, those acts and omissions listed in paragraphs 96-99 and 106 of this Complaint.

113.   Under Georgia law, as part of their fiduciary duties, the directors and officers of a corporation who control and have charge of the corporation's effects are bound to care for its property and manage its affairs in good faith.   In the same manner as trustees, directors and managers are liable to account for any violation of these duties resulting in waste of a corporation's assets and/or injury to its property.   In this regard, Georgia statutory law provides that a director or officer of a corporation may be sued for "[t]he acquisition, transfer to others, loss, or waste of corporate assets due to any neglect of, failure to perform, or other violation of duties." O.C.G.A. § 14-2-831.

114.   By their actions and inactions described in this Complaint, the Defendants failed and neglected to perform their respective duties as officers and/or directors of the Bank, constituting breaches of their fiduciary duties owed to the Bank.   Specifically, but without limitation, Defendants allowed the Bank's

assets to be wasted by approving the Exemplar Loans without adherence to the Bank's Loan Policy such that no business person of ordinary, sound judgment would conclude that the Bank received adequate consideration in exchange for making the loans.

115.   As a direct and proximate result of the breaches of fiduciary duties by Defendants, the FDIC-R suffered damages in an amount to be determined at trial.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for First National Bank of Georgia, requests entry of judgment in its favor against Defendants as follows:

1.   For compensatory damages and other damages, jointly and severally, of at least $29.97 million, and any excess amount as may be proved at trial;

2.   For its costs of suit against all Defendants;

3.   For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l) and O.C.G.A. § 51-12-14;

4.   Such other and further relief as the Court deems just and proper; and,

5.   Plaintiff demands a trial by jury on all issues.

Respectfully submitted this 25th day of January, 2013.


/s/ *David L. Turner*
David L. Turner
Georgia. Bar No. 004530
Joseph L. Kelly
Georgia Bar No. 412967
Abby von Fischer-Benzon
Georgia Bar No. 542723

***Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for First National Bank of Georgia***

Schulten Ward & Turner, LLP
260 Peachtree Street, N.W.
Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Telephone)
404-688-6840 (Facsimile)